326 F.2d 492
 Jacob GREEN et al., Appellants,
v.
TRANSITRON ELECTRONIC CORPORATION et al., Appellees.
William L. BERGER et al., Appellants,
v.
TRANSITRON ELECTRONIC CORPORATION et al., Appellees.
DIVERSIFIED GROWTH STOCK FUND, INC., et al., Appellants,
v.
TRANSITRON ELECTRONIC CORPORATION et al., Appellees.
 Nos. 6176, 6179, 6190.
 United States Court of Appeals First Circuit.
 Heard Nov. 5, 1963.
Decided Jan. 16, 1964.
 
 James D. St. Clair, Boston, Mass., with whom Jacob Green, Boston, Mass., Louis Loss, Cambridge, Mass., Marvin Cherner, Birmingham, Ala., Hale & Dorr and Poster, Wilinsky & Goldstein, Boston, Mass., were on brief, for Jacob Green and others.
 Lawrence Milberg, New York City, with whom William L. Berger, Boston, Mass., was on brief, for William L. Berger and others.
 Milton Pollack, New York City, with whom Harris Berlack and Barry H. Singer, New York City, were on brief, for Diversified Growth Stock Fund, Inc., and others.
 Harold M. Willcox, Boston, Mass., with whom Edward M. Condit, Jr., and Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., were on brief, for Leo Bakalar and others.
 Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit judges.
 HARTIGAN, Circuit Judge.
 
 
 1
 We have before us three appeals from the allowance and disallowance of counsel fees by the United States District Court for the District of Massachusetts, the requests for such fees arising out of work performed by the attorneys in producing an Agreement of Compromise and Settlement under which the sum of $5,300,000 was paid into court by defendants-appellees, Leo and David Bakalar, for payment of counsel fees, disbursements and distribution to stockholders in settlement of five law suits brought against the defendants.
 
 
 2
 Transitron Electronic Corporation is in the business of manufacturing and selling various types of semiconductors for commercial, industrial and military use. It was formed in 1952 by Leo and David Bakalar as a Massachusetts corporation and was reorganized as a Delaware corporation in 1959.
 
 
 3
 In the decade of the 1950's the electronics industry in general, and the semiconductor field in particular, experienced a rapid growth. New components and systems were developed. Concurrently, there was huge demand for a myriad of new products, the military for new weapons and industry for data processing and process control. These were particularly lush times for the semiconductor manufacturers and by the late 1950's Transitron had become one of the leaders of the entire electronics industry.
 
 
 4
 Until 1959 the Bakalars were the only substantial stockholders in Transitron. In 1959 and in the following year the Bakalars sold a total of 2,250,000 shares from their holdings at the respective prices of $36 and $35 a share. Both offerings were duly registered with the Securities and Exchange Commission and were underwritten by leading national investment firms headed by Merrill Lynch, Pierce, Fenner & Smith. The year 1961, however, saw a general fall in the market for electronics stock, with shares of Transitron tumbling to less than 50 per cent of their highest value in that year. At about this time various actions were brought against Transitron and against the Bakalars by disappointed investors in an effort to recoup some of their losses.
 
 
 5
 The first stockholder action was brought in the United States District Court for the District of Massachusetts on November 8, 1961 by plaintiffs Marvin Cherner and Cherner Clothing Company. Named as defendants were Transitron, individuals of that corporation and Merrill Lynch. The suit also purported to be a spurious class action under Fed.R. of Civ.P. 23(a)(3), two of the counts in the four count amended complaint being brought on behalf of 'all persons who have bought any shares of common stock of Transitron since December 8, 1959' in either of the distributions covered by the two registration statements in issue, and on behalf of 'all persons to whom defendant (Merrill Lynch) has sold any shares of Transitron since December 8, 1959.'[1]
 
 
 6
 The amended complaint rested entirely on what have become known as the 'patent allegations,' to wit, that the prospectuses which were the basic part of the two registration statements which Transitron filed with the SEC prior to its two public stock offerings were materially false in stating that Transitron 'holds no patent licenses from others requiring the payment of royalties and knows of no patent rights of others which might interfere with the conduct of its business.' According to the Cherner complaint this statement was false or misleading because Transitron had been sued, subsequent to the second offering of stock, by Western Electric Company for the alleged infringement of Western Electric patents, the suit thereafter having been settled by means of a license agreement under which royalties became payable upon Western Electric patents used by Transitron.
 
 
 7
 Counsel for the plaintiffs in the Cherner action were James D. St. Clair, Esq., (the senior trial counsel), Louis Loss, Esq., Jacob Green, Esq., and Marvin Cherner, Esq. They are appellants here and will hereinafter be referred to as the Green group.
 
 
 8
 On March 30, 1962, Financial Industrial Fund, Inc. (F.I.F.), a mutual fund with 50,000 shares of Transitron purchased from Merrill Lynch, brought suit in the court below against the same defendants, basing its complaint on identical 'patent allegations.' The suit was instituted on behalf of F.I.F. by appellants Green, Loss and St. Clair.
 
 
 9
 On April 6, 9 and 10, 1962, respectively, plaintiffs-appellants (1) Diversified Growth Stock Fund, Inc., (2) Wellington Fund, Inc. and Wellington Equity Fund, Inc., and (3) One William Street Fund, Inc. (hereinafter referred to as the Delaware group), filed in the Delaware Superior Court three separate complaints against Transitron Electronics Corporation et al., but not against Merrill Lynch. Along with the 'patent allegations' the complaints contained what have become known as the 'accounting allegations,' to wit, that the registration statements contained certain misstatements and omissions with respect to valuation of inventory, price and production difficulties, price deterioration, and competitive problems of Transitron. These allegations were broadly drawn. The Delaware group was represented by Milton Pollack, Esq., of New York, who is also an appellant here.
 
 
 10
 On April 16, 1962, F.I.F. amended its complaint to include the 'accounting allegations.' A motion to similarly amend the Cherner complaint was denied on April 30, 1962. On August 6, 1962 Judge Wyzanski denied the defendants' motion for summary judgment in the Cherner suit. On September 25, 1962 the same court denied in the F.I.F. action the defendants' motion for summary judgment with respect to the count setting forth the 'accounting allegations.' On October 19, 1962 the court in the Cherner case ordered that all issues as to whether there were misstatements or omissions in the registration statements with respect to the patent question be severed for separate trial. Twenty-two persons had been granted permission to intervene in the Cherner action before the court announced on September 26, 1962 that 'no further permissions for intervention are likely to be granted.' The suits maintained by the Delaware group were not brought to issue until October 31, 1962 when defendants filed their answers in those cases.
 
 
 11
 During the summer and fall of 1962 discussions looking to the settlement of all cases took place involving all counsel who had appeared in the five actions. Determined settlement negotiations comcenced in November 1962 and were completed in December of that year, the basic principles contained in the settlement arising out of a single session held at the offices of Hale & Dorr in Boston on November 10. The proposed settlement was conditionally approved by Judge Wyzanski and made part of a Conditional Judgment dated December 26, 1962. On the same day the court issued a show cause order directed to all persons who prior to February 21, 1962 had purchased shares of Transitron 'to show cause why the Agreement of Compromise and Settlement should not be approved and the conditional judgment entered by the Court made final.' Such persons were invited to file written objections to the Agreement on or before January 16, 1963 and, at their election, be heard on them at a hearing to be held on January 23, 1963. Following the January 23 hearing, the court filed an opinion indicating that final approval would not be granted until certain amendments were made in the proposed settlement. The parties thereafter having amended the proposed settlement to conform to the court's opinion and its January 28, 1963 memorandum, a final judgment approving the amended Agreement of Compromise and Settlement was entered on February 1, 1963.
 
 
 12
 In essence the amended Agreement provided for the payment into court by the defendants Bakalar of $5,300,000 in full settlement of the claims asserted against defendants in the foregoing litigation. Persons who prior to February 21, 1962 had acquired Transitron stock, who had incurred losses on that stock between a value per share of $36 and $15, and who had applied to participate in the fund within a stated period of time, would be entitled to participate ratably in the distribution of the fund after the payment of fees and expenses. From the $5,300,000 fund disbursements were to be made by the court:
 
 
 13
 '(a) To reimburse the plaintiffs and intervenors in the lawsuits listed in paragraph 1 above for fees and expenses heretofore actually paid by them to the undersigned counsel.
 
 
 14
 '(c) To pay, to the extent approved by the Court, the fees and disbursements of counsel of record heretofore appearing for plaintiffs and intervenors in (all five of the actions) * * *. Plaintiffs and intervenors in said actions may urge all applicable grounds which support their claims for such fees and expenses. No party to this agreement shall object to or appeal from any allowance of such compensation on the ground that as a matter of law such compensation may not be based on the amount of the entire fund in Court. No fees or disbursements of counsel for defendants shall be paid out of the fund.
 
 
 15
 * * * *'ent
 
 
 16
 In compliance with paragraphs (a) and (c) above, counsel for plaintiffs and intervenors submitted applications and petitions to the court on the basis of which the court made the following awards: To the Green group $200,000 compensation was awarded and $5,889.75 disbursements; $750,000 compensation had been requested. To Milton Pollack and his associates $65,000 was awarded and $1,239.95 disbursements; $250,000 compensation had been requested. Appellants Lawrence Milberg and William L. Berger, counsel for appellant Jack Kassof, an objecting member of the class, were held not to be entitled to any of their $75,000 request. Disbursements totalling $1,005.11 were allowed to the Delaware group. An award of $189.31 counsel fees and disbursements was made to George I. Mulhern, Jr., who does not appeal.
 
 
 17
 The Green group appellants believe their award too low, but are satisfied to 'leave the question of the sufficiency of our award to the Court.' Their primary concern in their appeal is that 'if the award of counsel fees to the Pollack group is increased by the Court, the award of counsel fees to us should be increased proportionately so as to maintain the ratio of at least three to one set by the court below.'[2] Appellants Pollack and the Delaware group contend that they were misled by the district court to their prejudice; that the award of fees and reimbursements was based on error and failure of the court to recognize their contribution to the total fund in court; that in relative terms their award is 'utterly disproportionate to the other allowances.' Appellants Milberg and Berger believe they were wrongfully deprived of an allowance by the court below.
 
 
 18
 The fixing of the amounts of attorneys' fees must, of necessity, be a matter within the discretion of the district court. The lower court 'has far better means of knowing what is just and reasonable than an appellate court can have.' Trustees v. Greenough, 105 U.S. 527, 537, 26 L.Ed. 1157 (1881). It is the lower court that has lived with the case and, therefore, is more alert to the merits of each request for counsel fees. Discretion, however, is not exercised in a vacuum, and in Angoff v. Goldfine, 270 F.2d 185, 189 (1st Cir. 1959), this court listed the factors 'to be carefully considered and weighed in fixing the amounts of compensation to be awarded' by the district court:
 
 
 19
 '* * * These factors are: the amount recovered for the corporation; the time fairly required to be spent on the case; the skill required and employed on the case with reference to the intricacy, novelty and complexity of issues; the difficulty encountered in unearthing the facts and the skill and resourcefulness of opposing counsel; the prevailing rate of compensation for those with the skill, experience and standing of the attorneys, accountants or others involved; the contingent nature of the fees, with the accompanying risk of wasting hours of work, overhead and expenses (for it is clearly established that compensation is awarded only in the event of success); and the benefits accruing to the public from suits such as this. * * *'
 
 
 20
 Unlike the situation present in Angoff, we are not hampered by the failure of the court below to indicate the reasons for its actions. In a well documented opinion accompanying and explaining the awards, the court quoted and adhered closely to the factors listed in the Angoff opinion.[3] It is unnecessary for this court to review each factor and comment on its application. Suffice to state that we can find no abuse of discretion in the awards to Pollack, the Delaware group or the Green group appellants. The court's determination that the Green group played a more effective role in bringing about the settlement than did Pollack and the Delaware group is supported by the record. We do not believe that the awards to these appellants are low, under the circumstances. While it would constitute a penalizing of efficiency and expediency to deprive counsel of compensation for benefits obtained short of going to trial, the fact that the actions were terminated prior to extensive litigation is deserving of much practical consideration. The settlement of the five suits avoided for the plaintiffs the heaviest part of their burden: further discovery, preparation for trial, appearances in court, and the possibility of ultimate failure with the result of no compensation whatever. Nor was the probability of the plaintiffs' eventual success promising. The district court assessed the chances of plaintiffs' recovery on the 'patent allegations' as no better than '50-50 or 60-40.' With respect to the 'accounting allegations' it was the court's conclusion that 'it seems more than possible that at the close of the evidence in a plenary trial plaintiffs might not prevail.'
 
 
 21
 The Green group avowedly and Pollack impliedly requested the lower court to accept as a basis for computing its counsel fees a standard percentage formula. Had the court followed this request a distorted result would have been produced. The amount of the fund was such that almost any numerical percentage would have compensated counsel to a degree far in excess of what the circumstances warranted and, upon appeal, such awards might possibly have been reversed. Central Railroad and Banking Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); Twentieth Century-Fox F. Corp. v. Brookside Th. Corp., 194 F.2d 846 (8th Cir. 1952), cert. denied, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952); Milwaukee Towne Corp. v. Loew's Inc., 190 F.2d 561 (7th Cir. 1951), cert. denied, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952).
 
 
 22
 Appellants Pollack and the Delaware group contend that their awards fail 'to honor the reasonable expectations of the appellants which resulted from the Court's assurances and on the basis of which the appellants made substantial changes in position to their prejudice.' They contend that their 'expectation of reimbursement'[4] and 'expectation of compensation for producing the entire settlement fund'[5] were not met. We cannot agree with these arguments.
 
 
 23
 The original Agreement of Compromise and Settlement provided for the payment into court of $5,000,000 by the defendants. An additional payment of $1 per share was to be given to each of the mutual fund plaintiffs as a bargained estimate of their legal and related internal costs. The Delaware group representing 250,000 shares and F.I.F. representing 50,000 shares were to be paid an aggregate amount of $300,000 as a guaranteed amount completely apart from the original settlement fund. In return for this special treatment counsel for the mutual funds waived any right to seek compensation from the general settlement fund. This agreement would have insured to Pollack counsel fees of close to $250,000. The court, however, refused to approve the provision for the additional payment. In its opinion dated January 24, 1963 the court stated:
 
 
 24
 '5. But while this Court is not prepared to approve the present proposed arrangements with the investment trusts, it will approve a settlement under which defendants pay into court $5,300,000, and this Court makes allowances, up to a maximum of $300,000, to reimburse the investment trusts for their expenses of litigation and attorneys' fees. In short, this Court is prepared to make what, on evidence submitted in open court it finds to be just compensation to the Delaware plaintiffs for 'having conducted separate proceedings, having carried separate management (of litigation) burdens and having incurred separate expenses and obligations to counsel."
 
 
 25
 Thereafter in response to an inquiry made by Pollack on behalf of the Delaware group, Judge Wyzanski made his position still more clear in a memorandum dated January 28, 1963.
 
 
 26
 '3. Beyond indicating in its opinion of January 24, 1963 that $300,000 would be the maximum amount payable to the investment trusts for their contribution to the settlement, this Court has never directly or indirectly, up to this time, given any indication what allowances it would make for expenses, attorneys' fees, or contributions. It would be a grave error to assume that the Court has acquiesced in any allowances to anyone or everyone 'which will materially deplete the dividend eventually payable to' shareholders. And no one has authority from this Court for 'negotiating a formula' which seeks to pre-empt or govern the judicial authority to make appropriate allowances.'
 
 
 27
 In spite of the statements by the court and the terms of the Agreement relating to payment of counsel fees previously quoted-- and the record discloses no contradictions-- Pollack and the Delaware group state in a reply brief that they understood 'that the $300,000 would be disbursed to counsel for F.I.F. ($50,000) and counsel for the Delaware plaintiffs ($250,000) as had been agreed by the defendants; but that such disbursements would be upon requisite proof to the court that separate litigation expenses had been incurred and valuable services rendered.' Thus their belief was that after a pro forma presentation of evidence to the court, the extra payment would be doled out as quickly as it was put in. This was obviously not the intention of the district court and any misunderstanding on this point was not due to reliance on 'the Court's assurances.' Pollock and the Delaware group took their chances when they agreed to the amended settlement providing for fees and disbursements to be paid them 'to the extent approved by the Court' based on evidence submitted 'to support their claims for such fees and expenses.'
 
 
 28
 We think some allowance should have been awarded to appellants Milberg and Berger who acted as counsel for appellant Kassoff. Kassoff was a member of the class represented in the Cherner suit and owner of 7,800 shares of Transitron stock. Pursuant to the lower court's show cause order of December 26, 1962 directed to the class and inviting objections to the proposed settlements, Kassoff filed an affidavit and his two attorneys filed a memorandum and orally argued against giving the extra payment to the mutual funds; it was argued that the giving of such payment would be 'a violation of the fiduciary imperatives inherent in a class action.' This view was ultimately adopted by the court but counsel were refused compensation for their efforts because, in the words of the court, 'Before this Court heard or knew of the objections of Messrs. Milberg and Berger it had determined not to approve the settlement unless the $300,000 were added to the $5,000,000 instead of being paid to the mutual funds.' However, at the time the objections were raised by Milberg and Berger none of the court's misgivings were a matter of record and all other counsel for plaintiffs and defendants were on record as approving of the proposed settlement which had been made part of the court's Conditional Judgment.[6]
 
 
 29
 We think it unfair to counsel when, seeking to protect his client's interest and guided by facts apparent on the record, he spends time and effort to prepare and advance an argument which is ultimately adopted by the court, but then receives no credit therefor because the court was thinking along that line all the while. Appellant Kassoff was not a volunteer but came in at the invitation of the court. His attorneys should not be denied compensation for reasons not apparent on the record, especially when the objections advanced resulted in a benefit to the class involved in the proceedings. Sprague v. Ticonic Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).
 
 
 30
 Although infrequently exercised, there is no doubt as to the appellate court's power to fix appropriate fees. Powell v. Pennsylvania Railroad Company, 267 F.2d 241 (3rd Cir. 1959); Darden v. Besser, 257 F.2d 285 (6th Cir. 1958); Silver v. Rosenberg, 139 F.2d 1020 (2d Cir. 1944). Accordingly, for their contribution to the final settlement arrangement appellants Milberg and Berger are awarded total compensation of $1,500. They are also entitled to their disbursements of $84.00.
 
 
 31
 Judgment will be entered affirming the judgment of the district court as modified. The fee allowed appellants Berger and Milberg, and their costs on this appeal, are to be paid out of the fund; no other costs.
 
 
 
 [1]
 The four counts were based on 11 and 12(2) of the 'Securities Act of 1933,' 15 U.S.C. 77k, 77l (1958), 12(2) directed against Merrill Lynch. An earlier aspect of this suit, Cherner v. Transitron Electronic Corporation, is reported in 201 F.Supp. 934 (D.Mass.1962)
 
 
 [2]
 The reference is to a finding by the court below 'that the Green group was more than three times as important a producing cause of the settlement, and made three times as significant a contribution to the settlement, as did the Pollack interests.' However, the court also stated that the $200,000 award to the Green group was 'the most it was appropriate to award, even for a $5,300,000 recovery. * * *'
 
 
 [3]
 In view of the court's close adherence to the factors listed in Angoff, we are unimpressed with the argument that the court did not apply federal equity principles in making the awards
 
 
 [4]
 The contention that the court erred in failing to reimburse the Delaware group for counsel fees 'heretofore actually paid by them' prior to the settlement, as called for in P3(a) of the Agreement of Compromise and Settlement, as amended, is without merit. The court stressed the point that the allowance of $65,000 (together with disbursements of $1,233.95) 'was intended as a recognition of all the services of the Pollack group and their clients except for disbursements not otherwise compensated' which were allowed in the amount of $1,005.11. With respect to the $15,000 retainer paid Pollack by the Delaware group, the court, in discussing all retainers paid all counsel, stated that 'Whether those sums must be returned by counsel to clients is a question on which I do not pass, inasmuch as it is not within my jurisdiction and, in any event, I do not have before me all the facts with respect to the retainer.'
 
 
 [5]
 The addition of the $300,000 to the $5,000,000 fund made it an integral part of that fund, depriving the mutual funds and their attorneys of any exclusive rights they originally had in the extra amount. The record is clear that attorney Pollack was compensated according to the value placed by the court on his and the Delaware group's part in producing the final settlement. Counsel fees were to be paid from the total fund before any distribution was made to the beneficiaries
 
 
 [6]
 The court also referred to written objections to the additional payment received from many Transitron stockholders and on file in the Clerk's office. However, only one or two of the letters expressly protested the additional payment